IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Roberts Enterprises, LP, d/b/a Mayday Golf<br><br>Plaintiff,<br><br>vs.<br><br>Fun Sport, Inc., d/b/a Midway Speedway, d/b/a Fire Mountain Golf, and d/b/a Fire Mountain Rescue Mini-Golf<br><br>Defendant. | Case No. 06-490-JJF<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**<br><br>**(Oral hearing requested)** |

Dated: September 28, 2007

Rex A. Donnelly, IV (Delaware ID # 3492)
RatnerPrestia
1007 Orange Street, Suite 1100
Post Office Box 1596
Wilmington, Delaware 19899
PHONE: 302.778.2500
FACSIMILE: 302.778.2600

## TABLE OF CONTENTS

I. NATURE AND STAGE OF THE PROCEEDING ............................................................. 1
II. SUMMARY OF ARGUMENT ........................................................................................... 1
III. STATEMENT OF FACTS .................................................................................................. 2
IV. ARGUMENT ....................................................................................................................... 5
   A. STANDARD OF LAW ................................................................................................ 5
   B. ANALYSIS .................................................................................................................. 7
V. CONCLUSION. ................................................................................................................. 13

## TABLE OF AUTHORITIES

### CASES

*Brown v. Nationscredit Commercial*,
  2000 U.S. Dist. LEXIS 9153 (D.Conn. June 23, 2000) .......................................................... 5

*Corwin v. B'nai Brith Senior Citizen Housing, Inc.*,
  212 Fed. Appx. 119 (C.A. (Del.) Jan. 9, 2007) .................................................................... 5

*Green v. John H. Lewis & Co.*,
  436 F.2d 389 (3d Cir. 1970) ................................................................................................ 5

*Leonard v. University of Delaware*,
  204 F.Supp.2d 784 (D.Del. 2002) .............................................................................. 6, 7, 12

*Malave v. Carney Hosp.*,
  170 F.3d 217 (1st Cir. 1999) ................................................................................................ 6

*Omega Engineering, Inc. v. Omega, SA*,
  414 F.Supp.2d 138 (D.Conn. 2004) ..................................................................................... 6

*Pugh v. Super Fresh Food Mkts., Inc.*,
  640 F.Supp. 1306 (E.D.Pa. 1986) ........................................................................................ 5

*Sadighi v. Daghighfekr*,
  66 F.Supp.2d 752 (D.S.C. 1999) .......................................................................................... 6

*Schwarzschild v. Martin*,
  191 Conn. 316, 464 A.2d 774 (1983) .................................................................................. 5

*Schwitzer v. Panteloeakos*,
  1998 WL 918790, *1, 1998 Conn.Super. LEXIS 3602, at *1 (Conn.Super.Ct.
  Nov. 29, 1998)) .................................................................................................................... 5

*United States v. ITT Continental Baking Co.*,
  420 U.S. 223 (1975) ............................................................................................................. 7

*V'Soske v. Barwick*,
  404 F.2d 495 (2d Cir. 1968) ................................................................................................. 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Roberts Enterprises, LP, d/b/a Mayday Golf<br><br>Plaintiff,<br><br>vs.<br><br>Fun Sport, Inc., d/b/a Midway Speedway, d/b/a Fire Mountain Golf, and d/b/a Fire Mountain Rescue Mini-Golf<br><br>Defendant. | Case No. 06-490-JJF<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**<br><br>(Oral hearing requested) |

The Plaintiff and counterclaim defendant Roberts Enterprises, LP, d/b/a Mayday Golf, (hereinafter "Roberts Enterprises") hereby moves the Court for an Order enforcing the settlement agreement that was reached between the parties on July 27, 2007. The reasons for this Motion are set forth and fully explained below.

**I.   NATURE AND STAGE OF THE PROCEEDING**

This proceeding is an action in which Roberts Enterprises seeks relief for federal and state trademark and trade dress infringement, false designation of origin, trademark dilution, unfair competition, and state deceptive trade practices arising from Fun Sport's use of an authentic airplane suspended above a miniature golf course, for which Roberts Enterprises owns U.S. Trademark Registration No. 2,623,494. Fun Sport has counterclaimed for cancellation of Registration No. 2,623,494. The parties have recently concluded settlement negotiations before the close of discovery, resulting in the settlement agreement that Plaintiff now seeks to enforce.

**II.   SUMMARY OF ARGUMENT**

A.   Fun Sport and Roberts Enterprises agreed to all of the essential terms of a valid and enforceable contract.

    B.    Fun Sport cannot escape its obligations under the settlement agreement merely because it has changed its mind with respect to an essential term to which it already agreed.

### III. STATEMENT OF FACTS

Roberts Enterprises is the record owner of a United States Registration for a Service Mark consisting of an authentic airplane suspended above a miniature golf course. This registration issued on September 24, 2000 as Reg. No. 2,623,494 on the Principle Register of the United States Patent and Trademark Office and is valid and subsisting. See, registration information printed from United States Patent and Trademark Office database attached as Ex. 1. Roberts Enterprises applied for, and was granted, the registration based upon its continuous use of the unique theme and trade dress indicated in the registration beginning on November 14, 1997 to identify, promote and market its miniature golf course services to the public. Pursuant to U.S. trademark laws, this registration grants Roberts Enterprises the exclusive right to stop others from using the registered mark or marks that are confusingly similar thereto in commerce in the United States.

Roberts Enterprises has been very successful in the miniature golf course business. Its miniature golf course, Mayday Golf, has been featured in a television program on the Travel Channel and designated one of the top ten miniature golf courses in the United States. Based on the success of the operation, Roberts Enterprises has licensed the use of its registered service mark and trade dress to miniature golf courses throughout the eastern United States. One such licensee is BMS Golf, LLC (hereinafter "BMS Golf") which operates the Lost Treasure Golf miniature golf course at 13903 Coastal Highway in Ocean City, Maryland. The license granted the right for BMS Golf to use the service mark and trade dress in an exclusive territory that includes Rehoboth Beach, Delaware including the location of Defendant's miniature golf course.

2

Defendant and counterclaim plaintiff Fun Sport, Inc., d/b/a Midway Speedway, d/b/a Fire Mountain Golf, and d/b/a Fire Mountain Rescue Mini-Golf (hereinafter "Fun Sport") owns and operates a miniature golf course at Highway One at Midway in Rehoboth Beach, Delaware. In October of 2004, Roberts Enterprises learned that Fun Sport had been using an airplane above its miniature golf course to promote and market its Fire Mountain Golf miniature golf course (hereinafter "Fire Mountain Golf") to the public. Roberts Enterprises immediately informed Fun Sport of its service mark registration and belief that the trade dress, namely, use of the airplane at Fire Mountain Golf, infringed Roberts Enterprises rights and requested that Fun Sport discontinue its use of the airplane. As a result of Fun Sport's refusal to comply with Roberts Enterprises' request, the above-captioned action was filed to enforce the trademark rights conferred by Roberts Enterprises' registration.

Shortly after commencing the action, and after an exchange of written discovery, counsel for Roberts Enterprises began informal negotiations to settle the action by sending a written offer of settlement to Fun Sport on May 18, 2007. See, correspondence attached as Ex. 2. This offer of settlement was enabled by a side agreement between BMS Golf and Roberts Enterprises in which BMS Golf agreed to an exception to its exclusive licensed territory to authorize the Fire Mountain Golf location. In addition to establishing that settlement would hinge upon the payment of royalty fees, all communications to Fun Sport, including the initial letter from Roberts Enterprises, were explicit that if a full license agreement became necessary, the license would be limited to Fun Sport's current sole location in Rehoboth Beach because of the existing license to BMS Golf and associated exclusive territory that encompassed the Fire Mountain Golf miniature golf course. See, Ex. 2 and series of correspondence attached as Ex. 3. Early in the negotiations Roberts Enterprises furnished to Fun Sport for their review and consideration a copy of the existing confidential BMS Golf license agreement. See, Ex. 2. Several communications

3

were exchanged between counsel negotiating the terms of the agreement. See, Ex. 3. Negotiations continued until July 27, 2007, when Fun Sport explicitly accepted Roberts Enterprises' offer. See, correspondence attached as Ex. 4.

Subsequently, a draft settlement and corresponding license agreement were prepared by Roberts Enterprises' counsel and forwarded to Fun Sport's counsel for review on August 20, 2007. Revisions were made to the document by Fun Sport's counsel and returned to Roberts Enterprises on August 30, 2007. The only revision by Fun Sport's counsel of significant divergence included one to grant Fun Sport an *exclusive* license to use the service mark at its golf course and within a ten (10) mile radius of its golf course. See, "redlined" Settlement and License Agreement, attached Ex. 5. This had never been offered by Roberts Enterprises and was the first time Fun Sport ever mentioned an *exclusive* license. In fact and as stated above, Fun Sport had been specifically told in the opening correspondence and all subsequent communications to the negotiations that any license Roberts Enterprises might grant would not extend beyond the Fire Mountain Golf course because of the existing license with BMS Golf. See, Exs. 2-4. Furthermore, Fun Sport was fully aware of the extent of the exclusive territory of the BMS Golf license because, among other communications, Fun Sport had been provided a copy of the BMS license agreement. Nonetheless, counsel for Roberts Enterprises reiterated to Fun Sport's counsel the rationale for the non-exclusivity of the proposed license, reminding Fun Sport's counsel of the existing license held by BMS Golf. See, correspondence attached as Ex. 6.

Fun Sport did not respond to Roberts Enterprises email correspondence until September 10, 2007 when counsel for Fun Sport sent an email informing Roberts Enterprises' counsel that Fun Sport was withdrawing its settlement and had decided to continue with the litigation. See, correspondence attached as Ex. 7. Fun Sport provided no explanation to Roberts Enterprises for

4

its withdrawal of settlement in its email correspondence. In fact, at no time has Fun Sport identified any reason for withdrawal of its prior acceptance. On information and belief, Fun Sport merely had a change of heart and decided that it no longer wished to settle on the terms to which it had already agreed.

IV.   ARGUMENT

    A.   **STANDARD OF LAW**

The Third Circuit has held that an agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing. *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir. 1970). See also, *Corwin v. B'nai Brith Senior Citizen Housing, Inc.*, 212 Fed. Appx. 119, 121 (C.A. (Del.) Jan. 9, 2007). Other courts have held similarly, as recently discussed by the U.S. District Court for the District of Connecticut:

> *Schwarzschild v. Martin*, 191 Conn. 316, 320-321, 464 A.2d 774 (1983) (parties may be bound even if contract not signed), cited in *Schwitzer v. Panteloeakos*, No. CV 950050211S, 1998 WL 918790, *1, 1998 Conn.Super. LEXIS 3602, at *1 (Conn.Super.Ct. Nov. 29, 1998)). "The only essential prerequisite for a valid settlement agreement is that [the parties] mutually assent to the terms and conditions of the settlement." Id., 2000 WL 888507, **1-2, 2000 U.S. Dist. LEXIS 9153, at **5-6, See also *Pugh v. Super Fresh Food Mkts., Inc.*, 640 F.Supp. 1306, 1308 (E.D.Pa. 1986), cited in *Brown v. Nationscredit Commercial*, No. 3:99cv592 (EBB), 2000 WL 888507, 2000 U.S. Dist. LEXIS 9153 (D.Conn. June 23, 2000, at *6 ("It is well recognized that an agreement to settle a lawsuit, voluntarily entered into, is binding on the parties.) Moreover, "a settlement is still binding even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time those terms are reduced to writing." *Brown*, 2000 WL 888507, *2, 2000 U.S. Dist. LEXIS 9153 at *6 (citation omitted). "Once a settlement is reached the agreement may not be repudiated by either party. Rather, such an agreement will be summarily enforced by the court." Id., 2000 WL 888507, *2, 2000 U.S. Dist. LEXIS 9153, at **6-7. See also *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir. 1968) (agreement enforced against defendant despite failure to agree on several significant terms).

5

*Omega Engineering, Inc. v. Omega,* SA, 414 F.Supp.2d 138, 148 (D.Conn. 2004). When this case was appealed, the Second Circuit found evidence of mutual assent to the settlement agreement at issue even though the agreement had not been signed by the party challenging the settlement. *Omega Engineering, Inc. v. Omega,* SA, 432 F.3d 437, 444 (C.A.2 (Conn.) 2005). The court looked to several factors to determine the intent of the parties: language used by the parties, circumstances surrounding the transaction, and the purposes of the parties and their motives to enter the settlement. *Omega Engineering,* 442 F.3d at 445. Cited by the court were the facts that the parties had entered the agreement to avoid a trial, the language of the parties' agreement did not establish that the obligations imposed by the contract were *contingent upon* the signing, and that counsel for the parties had represented that the matter had been settled. Id. at 445 (emphasis in original).

Filing of a Motion to Enforce Settlement is the appropriate procedure to follow when one party reneges upon a settlement agreement, as explained by the First Circuit:

> A party to a settlement agreement may seek to enforce the agreement's terms when the other party reneges. If, at the time of the claimed breach, the court case already has been dismissed, the aggrieved party may bring an independent action for breach of contract. **If, however, the settlement collapses before the original suit is dismissed, the party who seeks to keep the settlement intact may file a motion for enforcement.**

*Malave v. Carney Hosp.,* 170 F.3d 217, 219 (1st Cir. 1999) (emphasis added). See also, *Sadighi v. Daghighfekr,* 66 F.Supp.2d 752, 758 (D.S.C. 1999) (holding that exchange of letters constituted an enforceable settlement agreement). The question of jurisdiction should not be an issue as a majority of circuits "have uniformly stated that a district court possesses the inherent or equitable power summarily to enforce an agreement to settle a *case pending before it.*" *Sadighi,* 66 F.Supp. at 758, citations omitted (emphasis in original). See also *Leonard v. University of Delaware,* 204 F.Supp.2d 784, 787 (D.Del. 2002).

6

A settlement agreement is considered to be a contract. *Sadighi*, 66 F.Supp.2d at 759, citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). This court has previously indicated that enforcement of a settlement agreement depends upon whether the settlement agreement at issue is an enforceable contract under Delaware law. *Leonard v. University of Delaware*, 204 F.Supp.2d at 787. Under Delaware law, an enforceable contract exists if the parties have reached a definite agreement on all essential terms. Id.

B. **ANALYSIS**

1. **The Parties had Reached Agreement on All Essential Terms of the Settlement Agreement**

Upon review of the correspondence exchanged between Roberts Enterprises and Fun Sport, a reasonable person can only conclude that the parties had reached a definite agreement on the essential terms of settlement as required by Delaware law to establish existence of a contract. See *Leonard*, 204 F.Supp. at 787. Agreement on the essential terms of the agreement had clearly been reached. The negotiations between counsel regarding settlement prior to and including Fun Sport's acceptance include all of the essential terms of settlement: (1) a royalty fee paid as a lump sum payment, (2) the territory of the license extending only to the current and existing Fire Mountain Golf location, (3) a reasonable license/settlement agreement for Fun Sport's use of the registered service mark that protects the rights conveyed by the Mark (similar to Roberts Enterprises current licensee agreements), (4) agreement that Fun Sport can use the registered service mark and the airplane at the entrance of its miniature golf course, and (5) dismissal of all claims and counterclaims with prejudice. See Exs. 2-4. As provided in Fun Sport's communication accepting Roberts Enterprises' offer, the only outstanding issue between the parties was to determine the exact language to be used in the written license and settlement

7

agreements – this language being based upon the essential terms already agreed to by the parties in the offer and acceptance of settlement. See Ex. 4.

Fun Sport's initial letter of settlement provided that any royalty payment would have to be in the form of a lump-sum payment as opposed to a yearly royalty payment. See Ex. 3. Roberts Enterprises agreed to structure the payment in this respect and all subsequent negotiations were in terms of a lump-sum payment. A specific lump-sum payment was offered in Roberts Enterprises letter of July 25, 2007 and accepted by Fun Sport's counsel in an email on July 27, 2007. See Exs. 3-4.

The initial settlement offer and all subsequent communication from Roberts Enterprises made clear that the territorial reach of the license was specific to Fun Sport's current Fire Mountain Golf location and that this territorial reach was non-negotiable due to the existing licensee with BMS Golf. Roberts Enterprises provided a copy of the BMS Golf license agreement to Fun Sport which defined the BMS Golf territory as extending up to and beyond the Fire Mountain Golf location. Fun Sport never questioned the territory during the negotiations and must be held to have understood and accepted the limitations as an essential term. See Exs. 2-4.

It is clear from all communications between the parties that entry into a reasonable license/settlement agreement for Fun Sport's use of the registered service mark protecting Roberts Enterprises' rights was necessary and Fun Sport accepted this term in its correspondence of July 27, 2007. Extensive discussions and negotiations occurred between the parties' counsel before Fun Sport's counsel accepted Roberts Enterprises' offer of settlement in writing. See, Exs. 2-4. Based on previous communications, Fun Sport was aware that the terms of the license/settlement agreement would be based on the essential terms negotiated by the parties discussed above and were fully aware that the license agreement would closely mirror the BMS

8

Golf license. See Ex. 2. In fact, when Fun Sport wanted terms that were different from or not specifically addressed in the BMS Golf license, such as a lump-sum payment and relocating the airplane, these terms were negotiated and agreed to prior to Fun Sport's acceptance. See, Exs. 2-4. Furthermore, Roberts Enterprises was completely forthcoming with Fun Sport that the primary difference between the Fun Sport license and the BMS Golf license was the lack of exclusive territory to be given Fun Sport because of the BMS Golf license. See, Ex. 2. These facts clearly demonstrate that the remaining issues between the parties were not essential to the contract but merely one of form and semantics to be used in the settlement and license agreement.

The remaining essential terms included that Roberts Enterprises agree to allow Fun Sport to relocate the airplane to the entrance of the Fire Mountain Golf location and that the parties would dismiss all claims and counterclaims with prejudice. See Exs. 4-5. Roberts Enterprises agreed to these essential term and proceeded to draft the license and settlement agreement accordingly.

Fun Sport's actions affirm that all essential terms had been agreed upon at the time of acceptance of the settlement agreement. On August 20, 2007, Roberts Enterprises forwarded a draft license and settlement agreement to Fun Sport. Fun Sport then proceeded to edit the agreements and forwarded the changes back to Roberts Enterprises on August 30, 2007. Except for Fun Sport's attempt to add an exclusive territory to the contract, which was an attempt to renegotiate an essential term to which Fun Sport had already agreed to be bound, the only changes were semantics and minor comments to the overall license agreement. See, Ex. 5. Roberts Enterprises had very few comments with respect to Fun Sport's changes except for the exclusive territory addition.

9

2. **The Only Apparent Reason for Fun Sport's Withdrawal Was a Change of Heart With Respect to a Term to Which It Had Already Agreed**

Because no reasons were given for Fun Sport's withdrawal of its acceptance and because the only significant difference between Roberts Enterprises draft license agreement and Fun Sport's revisions to the license agreement was the addition of an exclusive territory provision, Fun Sport's withdrawal appears to have been based on a change of heart regarding the lack of exclusive territory. The fact, however, that Fun Sport added an exclusive territory to the license agreement, does not remotely show that the essential terms had not been agreed upon at the time Fun Sport accepted Roberts Enterprises' offer. Furthermore, a change of heart after acceptance of the agreement is *not* a valid reason for withdrawal from the agreement. *Brown*, 2000 WL 888507, *2, 2000 U.S. Dist. LEXIS 9153 at *6; *Pugh*, 640 F.Supp. at 1308.

3. **Fun Sport Was Aware That the Absence of an Exclusive Territory Was an Essential Term to Which It Had Already Agreed**

It was expressly an essential term to the agreement that Fun Sport would *not* have an exclusive territory and this term had already been accepted by Fun Sport. As discussed above, all negotiations were specific to the sole Fire Mountain Golf location:

> It is our intention that the legal terms of a full license agreement will closely mirror our license agreement with BMS Golf, LLC, our licensee in Ocean City, Maryland, *except* **that the license will *only* extend to your Miniature Golf Facility located at Highway One at Midway, Rehoboth Beach, Delaware 19971.**

Ex. 2 (emphasis added) (see also similar statements in Exs. 3 & 4). No "exclusive territory" was given or could be given because the Fire Mountain Golf miniature golf course was already located within the BMS Golf exclusive territory and where BMS Golf had the superior licensed rights to use the registered service mark. Fun Sport knew that Roberts Enterprises would not, and due to the terms of the existing license, could not contemplate such an offer. Fun Sport had

a copy of the BMS Golf license that provided an exclusive right to use the registered service mark well beyond the Fire Mountain Golf location. Furthermore, the first offer of settlement from Roberts Enterprises entertained that the license agreement would be in terms of a sublicense from BMS Golf rather than a direct license from Roberts Enterprises[1]. See, Ex. 2. Fun Sport never contested that issue. Fun Sport cannot claim any misunderstanding that an essential term of the settlement was that the license was nonexclusive and only extended to its Fire Mountain Golf location and that Fun Sport clearly had accepted this particular term of the agreement. Based on these facts, any reasonable person would have known that an essential term of the contract included that the license *only* extended to the Fire Mountain Golf location in settlement of the alleged infringement and no exclusive territory could be given.

While Fun Sport did state in its acceptance that it was "subject to review and agreement on the final terms of the settlement/license agreement," this boilerplate language should not allow Fun Sport to escape its agreement absent a genuine disagreement related to essential final terms that had not already been negotiated, and certainly should not allow Fun Sport to escape its agreement merely because it has changed its mind regarding previously agreed-upon essential terms of the settlement. "A settlement is still binding even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time those terms are reduced to writing." *Brown*, 2000 WL 888507, *2, 2000 U.S. Dist. LEXIS 9153 at *6; *Pugh*, 640 F.Supp. at 1308. No reasons were provided for Fun Sport's change of heart in the email from Fun Sport's counsel dated September 10, 2007. See Ex. 7. Further, when questioned by Roberts Enterprises during subsequent telephone conversations about the reasons for the withdrawal of Fun Sport's acceptance, Fun Sport did not identify any disagreements with

---

[1] The draft license agreement sent to Fun Sport on August 20, 2007 was not in terms of a sublicense but rather was in terms of a direct license from Roberts Enterprises. Roberts Enterprises and BMS Golf later amended their current license agreement to allow Roberts Enterprises to directly license Fun Sport to make the negotiations easier. Fun Sport never protested the fact that it was a direct license as opposed to a sublicense. If Fun Sport had protested, Roberts Enterprises would have merely reverted to a sublicense from BMS Golf as stated in the original offer.

11

specific terms in the license or settlement agreement as the cause for Fun Sport's withdrawal of its acceptance. The only revision to the license agreement by Fun Sport of significant divergence was the revision granting Fun Sport an *exclusive* license to use the service mark at its golf course and within a ten (10) mile radius of its golf course. See, Ex. 5. Thus, nothing in the "final terms" of the settlement/license agreement was a source of disagreement between the parties. In fact, the only essential term belatedly raised by Fun Sport for renegotiation was one to which it had already unequivocally agreed to be bound. As stated above, Fun Sport was fully informed that the lack of an exclusive territory was already an essential term of the agreement, and it had already agreed to this as a term of the settlement. Ultimately, Fun Sport had and has no reason to withdraw its settlement except for a change of heart.

Fun Sport clearly understood all the essential terms of the settlement with Roberts Enterprises. Fun Sport not only had ample time to review, question and negotiate all terms before accepting the settlement, but actually did negotiate and receive the desired terms that it wanted to negotiate and knew to be negotiable. Fun Sport cannot be permitted to back out of its agreement at the end of the negotiations when it is clear that the agreement is valid and free of defects. Fun Sport was fully informed of all the terms, including the territorial extent, of the license that Roberts Enterprises was willing to grant. Fun Sport negotiated the terms it was dissatisfied with before accepting the settlement.

Fun Sport's written acceptance following the exchange of correspondence between Fun Sport and Roberts Enterprises confirms the existence of a settlement agreement between these parties containing all of the essential terms. Like the plaintiff in *Leonard v. University of Delaware*, Fun Sport should not be permitted to back out of its agreement merely because it became dissatisfied with a term to which it previously agreed.

## V. CONCLUSION

For the foregoing reasons, Roberts Enterprises respectfully requests that the court grant its motion and issue an Order enforcing the valid settlement to which Fun Sport previously agreed.

Respectfully submitted,

/s/Rex A. Donnelly
Rex A. Donnelly, IV (Delaware ID # 3492)
RatnerPrestia
1007 Orange Street, Suite 1100
Post Office Box 1596
Wilmington, Delaware 19899
PHONE: 302.778.2500
FACSIMILE: 302.778.2600
radonnelly@ratnerprestia.com

Of Counsel:

John B. Hardaway III (Federal ID # 1710)
Amy E. Allen (Federal ID #9722)
NEXSEN PRUET ADAMS KLEEMEIER, LLC
201 W. McBee Avenue, Suite 400 (29601)
Post Office Drawer 10648
Greenville, South Carolina 29603-0648
PHONE: 864.370.2211
FACSIMILE: 864.282.1177
jhardaway@nexsenpruet.com

Attorneys for Plaintiff
Roberts Enterprises, LP

September 28, 2007
Wilmington, Delaware

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2007, that the attached documents were electronically filed with the Clerk of Court using CM/ECF which will send notification to the registered attorney(s) of record that the documents has been filed and is available for viewing and downloading:

Richard L. Horwitz
William R. Denny
James M. Kron
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
*Counsel for Defendant*

/s/Rex A. Donnelly
Rex A. Donnelly, IV (#3492)
RatnerPrestia
Nemours Building, Suite 1100
1007 Orange Street
Wilmington, DE 19801
(302) 778-2500
radonnelly@ratnerprestia.com

# EXHIBIT 1

Int. Cl.: 41

Prior U.S. Cls.: 100, 101 and 107

**United States Patent and Trademark Office**

Reg. No. 2,623,494
Registered Sep. 24, 2002

## SERVICE MARK
### PRINCIPAL REGISTER



ROBERTS, JOHN T (UNITED STATES INDIVIDUAL)
3088 MOUNTAINVIEW ROAD
CLOVER, SC 29710

FOR: MINIATURE GOLF COURSES, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 11-14-1997; IN COMMERCE 11-14-1997.

OWNER OF U.S. REG. NO. 2,333,624.

THE MARK IS COMPRISED OF AN AUTHENTIC AIRPLANE SUSPENDED OVER A MINIATURE GOLF COURSE.

SEC. 2(F).

SER. NO. 76-172,358, FILED 11-28-2000.

TONI HICKEY, EXAMINING ATTORNEY