**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ROBERTS ENTERPRISES, LP<br>d/b/a MAYDAY GOLF | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-490-JJF |
| | ) | |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| FUN SPORT, INC. d/b/a MIDWAY | ) | |
| SPEEDWAY, d/b/a FIRE MOUNTAIN | ) | |
| GOLF, and d/b/a FIRE MOUNTAIN | ) | |
| RESCUE MINI-GOLF | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT FUN SPORT, INC.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENT

Richard L. Horwitz (#2246)
William R. Denny (#2580)
James M. Kron (#3898)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19889-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
wdenny@potteranderson.com
jkron@potteranderson.com

*Attorneys for Defendant Fun Sport, Inc.*

October 10, 2007
Public Version Dated: October 17, 2007

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

NATURE AND STAGE OF PROCEEDINGS ......................................................... 1

SUMMARY OF ARGUMENT ................................................................................ 2

STATEMENT OF FACTS ....................................................................................... 3

      A.    Roberts Enterprises, Inc.'s Licenses ........................................................ 3

      B.    Fun Sport, Inc.'s Miniature Golf Facility ................................................ 5

      C.    The History Of Settlement Discussions .................................................. 5

      D.    Roberts' Proposed License Agreement .................................................... 8

      E.    Fun Sport's Counter Proposal .................................................................. 8

STANDARD OF DECISION .................................................................................. 11

      A.    Delaware Law Governs Plaintiff's Motion. .......................................... 11

      B.    Subjective Intentions Do Not Establish That An Agreement Was Reached. ........... 11

ARGUMENT .......................................................................................................... 12

I.      THERE IS NO SETTLEMENT AGREEMENT TO ENFORCE ..................... 12

II.     THIS COURT CANNOT COMPEL SPECIFIC PERFORMANCE OF AN
       AGREEMENT TO ENTER A CONTRACT ................................................... 15

CONCLUSION ....................................................................................................... 18

# TABLE OF AUTHORITIES

**CASES**

*Aber v. Ingram,*
   C.A. No. 96C-05-047, 1998 WL 442691 (Del. Super. Ct. May 14, 1998)..............................11

*Alro Associates, L.P. v. Hayward,*
   C.A. No. 19544, 2003 WL 22594526 (Del. Ch. Oct. 31, 2003)..............................................15

*Deene v. Peterman,*
   C.A. No. 1718-VCS, 2007 WL 216570 (Del. Ch. July 12, 2007)..........................................16

*Dittrick v. Chalfant,*
   C.A. No. 2156-VCL, 2007 WL 1039548 (Del. Ch. Apr. 4, 2007) .............................. 15-16, 18

*Erie Railroad Co. v. Thompkins,*
   304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938)................................................................11

*Franchetti v. Intercole Automation, Inc.,*
   523 F. Supp. 454 (D. Del. 1981).............................................................................................11

*In re Enstar Corp.,*
   604 A.2d 404 (Del. Super. Ct. 1992) ......................................................................................17

*Indus. America, Inc. v. Fulton Indus., Inc.,*
   285 A.2d 412 (Del. Ch. 1971).................................................................................................12

*Leeds v. First Allied Conn. Corp.,*
   521 A.2d 1095 (Del. Ch. 1986)...............................................................................................12

*Mell v. New Castle County,*
   C.A. No. 03M-06-030-JRS, 2004 WL 1790140 (Del. Super. Ct. Aug. 4, 2004). ..................11

*Ramone v. Lang,*
   C.A. No. 1592-N, 2006 WL 905347 (Del. Ch. Apr. 3, 2006) ..........................................11-12

*Western Natural Gas Co. v. Cities Services Gas Co.,*
   223 A.2d 379 (Del. Super. Ct. 1966) ......................................................................................15

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Roberts Enterprises, Inc. ("Roberts" or "Plaintiff"), has moved to enforce what it represents to be a settlement agreement between itself and defendant Fun Sport, Inc. ("Fun Sport"). The subject of the purported settlement agreement is resolution of a trademark infringement action brought by Roberts on December 22, 2005. (D.I. No. 1). Both parties are operators of miniature golf courses, and the trademark at issue is "an authentic airplane suspended above a miniature golf course." Specifically, Roberts asserts that an airplane resting atop a simulated volcano at Fun Sport's Fire Mountain Rescue Mini Golf facility in Rehoboth Beach, Delaware is likely to confuse patrons of Fun Sport's miniature golf facility into believing that it is associated with Roberts' miniature golf facility in Myrtle Beach, South Carolina.

With respect to the alleged settlement agreement, Roberts argues that it presented, and Fun Sport accepted, a two-part settlement agreement that comprised an agreement to resolve and dismiss all claims and counterclaims in the instant matter, and a license authorizing Fun Sport's use of Roberts' airplane trademark, in exchange for payment by Fun Sport of ▓▓▓▓▓▓▓. The monetary portion of the alleged agreement is not in dispute. Where the parties disagree is whether they reached a meeting of the minds on the scope and terms of the license.

On September 28, 2007, Roberts filed the instant motion to enforce the alleged settlement agreement and accompanying memorandum of law ("Opening Brief" or "OB"). (D.I. Nos. 42, 43). This is Fun Sport's Answering Brief in Opposition to that motion.

## SUMMARY OF ARGUMENT

1.   This Court cannot enforce a settlement agreement because no agreement exists to enforce.

2.   Even assuming that the parties reached an oral agreement to make a contract, this Court cannot compel specific performance of such oral agreement because Roberts' offer did not comply with the terms of such oral agreement, and Roberts rejected Fun Sport's compliant counteroffer.

## STATEMENT OF FACTS

In its complaint, Roberts represents that it is the owner of a registered service mark described as an "authentic airplane suspended over a miniature golf course" (the "Subject Mark"). Roberts applied to register the Subject Mark on the principal register of the United States Patent and Trademark Office ("PTO") on November 28, 2000. The PTO issued a registration certificate for the Subject Mark, identified as Registration Number 2,623,494 on September 24, 2002. (OB Exhibit 1).

### A.    Roberts Enterprises, Inc.'s Licenses

On August 17, 2002, Roberts entered into four license agreements for the use of the Subject Mark at four miniature golf courses. The licensees and locations of the subject miniature golf courses include; ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

Each of these license agreements granted the respective licensees a geographic "Territory" within which Roberts "agree[d] not to grant any other licenses to any other person or entity to use any Licensed Service Mark . . . that would overlap with any part of the Territory." ███████████ License (Ex. 2) at pp. 2-3).[3] Each license defined the Territory as a ███████ ███ around the licensee's miniature golf course. (Ex 2 Schedule A). The licenses also granted the licensees ███████████████████████████████████

---

[1]    Only the ███████████ facility in ███████████████ is pertinent to the issue before the Court.

[2]    Roberts has not identified the individuals that executed the four license agreements, but examination of the signatures on page 12 of each of the agreements suggests that they were signed by the same person.

[3]    All of the licenses are substantially identical. For convenience, Fun Sport references only the pages of the ███████████ license.

████████████████████████████████████████████████████████

(Ex. 2 at p. 3). The licensees thus control, and can exclude, any use of airplanes on miniature

golf courses not only within the licensees' █████████ of exclusive territory, but potentially

well beyond █████████████

      The licenses also authorize the licensees to use the Subject Mark at █████████

████████████████████████████████████████ to them. Specifically, the

licenses provide that the licensee may operate ████████████████████████████████████

███████████ (*Id.* at p. 3), and that ███████████████████████████████

█████████████████████████████████████████████ (*Id.* at p. 2).

Licensees are thus authorized to operate an unlimited number of miniature golf courses within

their respective territories.

      In exchange for the exclusive right to use the Subject Mark within their respective

exclusive territories, the licensees each agreed to pay Roberts an initial payment of ██████ plus

████████████ for each year that the licensee used the Subject Mark. (*Id.* at pp. 3-4). Because

each of the licenses was ██████████████████ each licensee paid Roberts ███████ upon

signing the license, and ██████ per year there after. Roberts thus received a total of ██████ on

██████████████ when the four licenses were signed, and ██████ per year thereafter.

      In addition to annual payments of ██████ the licenses also required the licensees

to "use the Licensed Service Mark in accordance with the guidance" that Roberts provided, and

authorized Roberts' representatives to inspect the licensees' premises twice a year to ensure

compliance with Roberts' requirements. (*Id.* at pp. 4-5).

---

[4]    The validity of the licenses rests upon the validity of the Subject Mark, which Fun Sport
disputes.

**B.    Fun Sport, Inc.'s Miniature Golf Facility**

Defendant Fun Sport operates a single miniature golf facility in Rehoboth Beach,
Delaware, identified as Fire Mountain Rescue Mini-Golf.  Fun Sport's Fire Mountain facility is
approximately a 25-mile drive north of BMS Golf, LLC's Ocean City, Maryland facility.  This
places Fun Sport's facility within the ███████████████ granted to ████████████
under the terms of its license with Roberts Enterprises.

**C.    The History Of Settlement Discussions**

Roberts first broached the subject of settling its dispute with Fun Sport in a letter
dated May 9, 2007 (Ex. 5 hereto).  In that letter, Roberts stated that it had reconsidered offering
Fun Sport a ██████ to use an airplane in the motif of its Fire Mountain miniature golf course
in exchange for an unspecified payment for use of the mark "as well as other parameters which
would ensure the viability of the service mark." *Id.*

Fun Sport responded the next day, May 10, 2007, via email, stating that it would
consider the terms of a proposed ███████ to determine whether further settlement discussions
were warranted.  (Ex. 6 hereto).

In a letter dated May 18, 2007, Roberts subsequently offered to settle its claims
against Fun Sport in exchange for a ███████████████████ for Fun Sport's use
of the Subject Mark, plus payment of an additional ██████ for Fun Sport's use of the mark in
2006, ██████ for use of the mark in 2007, and perpetual annual payments of ██████ per year
indefinitely into the future. (Ex. 7 hereto).  Roberts thus demanded an initial payment of ██████
and annual payments of ██████ indefinitely into the future.  This is ██████ what Roberts' other
licensees paid ███████████████████████████.  Roberts' letter expressly
deferred "discussion regarding a full license agreement" until its "monetary requests" were
resolved.  *Id.*  The terms of any license agreement were thus not at issue at this time.

5

Notwithstanding Roberts' representation that discussions regarding the terms of any potential license were deferred to a future date, Roberts' May 18, 2007 letter also stated that its intent was "that the legal terms of a full license agreement [would] closely mirror [Roberts'] license agreement with ██████████ . . . except that the license would only extend to [Fun Sport's] Miniature Golf facility [in] Rehoboth Beach, Delaware." *Id.* The letter did not explain what the term "only extend" meant.

Fun Sport responded to Roberts' settlement offer in a letter dated June 20, 2007. (Ex. 8 hereto). In that letter, Fun Sport offered to settle the dispute for a lump-sum payment of ██████ and was prepared to enter into a reasonable settlement agreement that would protect Roberts' claimed service mark. In response to Roberts' notation that it would only extend the license to Fun Sport's Rehoboth Beach, Delaware facility, Fun Sport agreed not to build any additional miniature golf courses with airplanes. *Id.*

Roberts counteroffered on June 29, 2007, proposing to settle for a lump-sum payment of ██████████████████████████████████ as a sublicense fee, and "entry into a reasonable license agreement that protects the Service Mark." (Ex. 9 hereto). This letter said nothing about the scope or terms of the license agreement other than that it would be "reasonable."

In a letter dated July 11, 2007, Fun Sport again counteroffered to settle the matter for ██████████████████ and a reasonable settlement agreement that would "allow [Roberts] to maintain the validity of its service mark." (Ex. 10 hereto). Fun Sport reiterated that it would agree not to build any additional miniature golf courses with airplanes. *Id.*

Counsel for the parties verbally discussed settlement in a telephone conversation on July 23, 2007, and, in a letter dated July 25, 2007 (Ex. 11 hereto), Roberts offered to settle its

6

claims against Fun Sport for no less than ████████████████████ and a "reasonable

settlement/license agreement." *Id.* That letter again said nothing about the scope or terms of the

license beyond that it would be "reasonable," but noted that Roberts' settlement discussions

involved a licensee which ██████████████████████████████████ *Id.* The

letter did not describe how its ██████████████████████████ how, if at all, those

limitations affected Fun Sport or the negotiations.

       Fun Sport accepted Roberts' July 25, 2007 settlement offer via email on July 27,

2007. (Ex. 12 hereto). That email stated; "Fun Sport accepts your client's offer subject to

review and agreement on the final terms of the settlement/license agreement." (Ex. 12). Fun

Sport's response requested that the settlement agreement specify that Fun Sport intended to

relocate the airplane at its miniature golf facility, and requested Roberts' counsel to prepare a

draft settlement agreement. *Id.*

       On July 31, 2007, Roberts' counsel advised that it was working on a draft

settlement/license agreement, but had ████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████ '" and requested counsel's patience while the

issues were resolved. (Ex. 13 hereto). Fun Sport's counsel responded simply "No problem."

(Ex. 13).

       On August 20, 2007, Roberts' counsel transmitted a draft settlement agreement

and a separate license agreement via email to Fun Sport's counsel. (Ex. 14 hereto). The

transmittal email stated that the proposed license agreement "closely mirrors our other license

agreements and our client has approved this version." *Id.*

**D.    Roberts' Proposed License Agreement**

As Roberts had represented, the proposed license agreement "closely mirrored" Roberts' other licenses except in one major respect, it had been █████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████ The proposed license instead defined the territory as "the miniature golf facility located at" Fun Sport's Rehoboth Beach, Delaware address. (License Agreement, Ex. 14 at p. 1). Whereas Roberts' other licenses granted an exclusive territory in which the licensee was assured that no competing uses of the Subject Mark would exist, the license offered to Fun Sport ███████████████████████████. As written, the proposed license authorized ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

As with the other licenses, Fun Sport would be required to use the Subject Mark "in accordance with the reasonable guidance furnished" by Roberts (*Id.* at ¶ 5), and Fun Sport's premises would be subject to inspections ████████████████████████████████. *Id.*

**E.    Fun Sport's Counter Proposal**

Fun Sport presented a counteroffer to Roberts on August 30, 2007. (OB Exhibit 5). In its counteroffer, Fun Sport accepted the majority of the proposed license agreement, but ████████████████████████████████████████████████████████ ██████████████████████████████████████████

Roberts responded to Fun Sport's counter proposal on September 5, 2007 via email. (Ex. 15 hereto). In this email, Roberts revealed for the first time that it had ████████████

8

███████████████████████████████████████████████

█████████████████████████████ *Id.* Fun Sport knew that it was █████████████

███████████████████████████████████████████████████████

Indeed, Fun Sport relied upon Roberts' assurances that it would enter into a "reasonable" license

agreement with Fun Sport that "closely mirrored" those other licenses. Fun Sport construed

these assurances to mean that Fun Sport would receive ████████████████████ and

believed that its proposal ████████████████████████████████████████

██████████████████ was reasonable. Such ████████████████ was entirely

consistent with Fun Sport's agreement that it would not build another miniature golf course with

an airplane. It simply offered to Fun Sport ████████████████████████

████████████████████████████

      Roberts responded to Fun Sport's counter proposal on September 5, 2007 (Ex.

15), and represented that something might be worked out whereby Roberts would agree ████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████ which included Fun Sport's facility in Rehoboth Beach, Delaware. *Id.*

███████████████████████████████████████████████

██████████████████████ (OB Exhibit 6).

      Prior to the breakdown of settlement talks, Fun Sport heard a rumor that ████

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████. This would explain why Roberts and ████████████

████████████████████████████████████████████ Roberts

never disclosed to Fun Sport during negotiations that ███████████████████████████████

████████████████████████████████ This was a significant fact that

Roberts should have known would be an important consideration to Fun Sport in deciding

whether to accept a settlement.

Under these circumstances, Fun Sport withdrew from settlement negotiations on

September 10, 2007 (Ex. 16 hereto), and advised Roberts that Fun Sport would proceed with

litigation.

## STANDARD OF DECISION

**A.    Delaware Law Governs Plaintiff's Motion.**

While established federal law governs Roberts' underlying claim of trademark

infringement, the matter that Roberts brings before the Court is strictly a contract dispute, and

thus, is governed by Delaware law. *Erie Railroad Co. v. Thompkins*, 304 U.S. 64, 58 S. Ct. 817,

82 L.Ed. 1188 (1938). "In so doing [the Court] 'must forsake its realm of expertise and assume

the aspect of a court of the forum state.'" *Franchetti v. Intercole Automation, Inc.*, 523 F. Supp.

454, 455 (D. Del. 1981) (quoting *Becker v. Interstate Properties*, 569 F.2d 1203, 1204 (3d Cir.

1977), *cert. denied*, 436 U.S. 906 (1978)).

Roberts does not dispute that Delaware law governs this matter.  (OB at 7) (noting

that "[u]nder Delaware law, an enforceable contract exists if the parties have reached a definite

agreement on all essential terms.").

**B.    Subjective Intentions Do Not Establish That An Agreement Was Reached.**

A settlement agreement is a contract. *Aber v. Ingram*, C.A. No. 96C-05-047,

1998 WL 442691, at *2 (Del. Super. Ct. May 14, 1998).  As the party seeking to enforce a

settlement agreement, Roberts has the burden of proving the existence of the contract by a

preponderance of the evidence. *Id.* If the words employed by the parties to describe the

settlement clearly and unambiguously reflect their intent to resolve this litigation, and describe

the manner by which the resolution is to be accomplished, the Court will enforce those terms

regardless of whether a party may later have second thoughts. *Mell v. New Castle County*, C.A.

No. 03M-06-030JRS, 2004 WL 1790140, at  * 3 (Del. Super. Ct. Aug. 4, 2004).

"In Delaware, the formation of a contract requires a bargain in which there is

manifestation of mutual assent to the exchange and consideration. [Citation omitted.] Overt

manifestations of assent rather than subjective intent control contract formation." *Ramone v.*

11

*Lang*, C.A. No. 1592-N, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006); *see also Indus.*

*America, Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. Ch. 1971) ("It is basic that overt

manifestation of assent-not subjective intent-controls the formation of a contract" (internal

citations omitted)). The Court's task is to determine "whether a reasonable negotiator in the

position of one asserting the existence of a contract would have concluded, in that setting, that

the agreement reached constituted agreement on all of the terms that the parties themselves

regarded as essential and thus that that agreement concluded the negotiations ..." *Leeds v. First*

*Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986).

## **ARGUMENT**

### I.    **THERE IS NO SETTLEMENT AGREEMENT TO ENFORCE**

The record does not support a finding that Fun Sport agreed to all essential terms

in the license agreement, and especially does not support that it accepted a license agreement

████████████████ It is undisputed that on July 27, 2007, Fun Sport agreed to enter into a

*reasonable* license agreement with Roberts. (Ex. 12). At that time, however, the terms of that

license agreement had never been discussed by the parties beyond casual references in

correspondence representing that the license would be "reasonable." Indeed, every document

upon which Roberts relies represents either that the license would be "reasonable," or would

"closely mirror" Roberts' license agreement with ████████████ (See May 18, 2007 letter,

Hardaway to Denny, at 2 ("the legal terms of a full license will closely mirror our license

agreement with BMS Golf, LLC"); June 20, 2007 letter, Denny to Hardaway, ("My client is

prepared to enter into a reasonable settlement"); June 29, 2007 letter, Hardaway to Denny

(proposing "entry into a reasonable license agreement"); July 11, 2007 letter, Denny to

Hardaway ("Fun Sport will ... enter into a reasonable settlement agreement"); July 25, 2007

letter, Allen to Denny, at 2 (offering "entry into a reasonable settlement/license agreement");

August 20, 2007 email (stating that the attached license agreement "closely mirrors our other license agreements."). None of the documents, from either party, discuss or even mention ████ ██████████████████████████████████████████████████████████ and none of Roberts' documents mention ████████████████████████████████████ ████████████████████████████ Indeed, the first time that Roberts revealed that it intended ████████████████████████████ was in the proposed license agreement that Roberts transmitted to Fun Sport on August 20, 2007. (Ex. 14). Contrary to Roberts' argument, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ (See OB at 8). Indeed, not one of Roberts' communications even ██████████████████████████████████████████ ████████████████████████████████████████████████.

Such a reference was consistent with Fun Sport's offer not to build additional miniature golf courses with airplane themes. However, ████████████████████████████ ██████████████████████████████████████████

Particularly absent from Roberts' communications is any reference to the signal terms in the existing license agreements such as ██████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ Whether by accident or design, these omissions led Fun Sport to believe that the reasonable license it had agreed to enter would include ████████ ████████████████████████████████████████████

Even in its Opening Brief, Roberts continues to discuss the ████████████████ ████████████████ Roberts states, for example, that Fun Sport's ██████████████████

████████████████████ (OB at 3); that the license ████████████████████

████████████████████████████████████████████████

██████████ (OB at 11). Even when Roberts does ██████████████████ the meaning

is still unclear. Roberts argues ████████████████████████████████

██████████████████████ (OB at 8). All of these statements can be

reasonably interpreted to mean ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ Indeed, Fun Sport agreed to do

just that. Moreover, even to the extent that this terminology might be construed ██████████████

██████████ Roberts points to nothing in the record to suggest that it ever informed Fun Sport of

this interpretation.

      Roberts also misses the mark when it represents that Fun Sport knew that Roberts

████████████████████████████████████████████ (OB at 10). ████████

████ apparently played a major role in defining the license that Fun Sport would receive. Indeed,

even in its Opening Brief Roberts is unclear about whether the parties understood ████████████

████████████████████████████████████ (OB at n.1).[5] While ████████████

██████████████ have been common knowledge within Roberts' counsel's office, Roberts

never communicated this information to Fun Sport.

      Furthermore, at least one of Roberts' arguments actually supports Fun Sport's

position. Roberts argues, for example, ████████████████████████████████████

██████████████████████████ (OB at 4). Fun Sport not only agrees with this

---

[5]   Roberts' assertion that Fun Sport never objected to whether the proposed license would be a ████████████████████████ demonstrates that even Roberts was unsure about a crucial element of the purported settlement agreement that it now seeks to enforce, namely, whether Fun Sport agreed to enter into a contract ████████████████████████

characterization, but asserts that it was precisely this knowledge that lead Fun Sport to believe

that the license Roberts would offer would include ██████████████ Fun Sport

certainly recognized ██████████████████ but this does not mean that it

understood ██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

Under Delaware law, objective manifestations of assent, not subjective intentions,

control the formation of a contract. *Western Natural Gas Co. v. Cities Services Gas Co.*, 223

A.2d 379 (Del. Super. 1966). Roberts points to nothing in the record to show Fun Sport's

objective manifestation of assent to a license agreement ████████████ What Roberts

offers instead are unsupported arguments about what it purportedly knows about Fun Sport's

subjective intentions, beliefs and understandings. In the absence of evidence demonstrating Fun

Sport's objective acceptance of the license agreement that Roberts now seeks to press upon it,

this Court must deny Roberts' motion to enforce a settlement agreement because there is no

agreement to enforce.

## II.    THIS COURT CANNOT COMPEL SPECIFIC PERFORMANCE OF AN AGREEMENT TO ENTER A CONTRACT

To succeed in an action for specific performance, the petitioner must show by

clear and convincing evidence that a valid contract exists, and the petitioner is ready, willing, and

able to perform its obligations under the contract. *Dittrick v. Chalfant*, C.A. No. 2156-VCL,

2007 WL 1039548, at *5 (Del. Ch. Apr. 4, 2007); *see also Alro Associates, L.P. v. Hayward*,

C.A. No. 19544, 2003 WL 22594526, at *7-8 (Del. Ch. Oct. 31, 2003) (applying clear and

convincing standard to enforcement of settlement agreement). "In other words, the court must be

certain of the essential elements of the contractual obligation it is asked to enforce. [Citation

omitted.] Uncertainty as to subsidiary contract terms, however, will not defeat a request for this equitable remedy." *Deene v. Peterman*, C.A. No. 1718-VCS, 2007 WL 216570, at *5 (Del. Ch. July 12, 2007).  The Court should deny an action for specific performance if the balance of the equities do not support such action. (*Dittrick* at *5) ("The balance of the equities also must favor the party seeking relief").

Fun Sport does not dispute that it agreed to settle this matter for ██████████ ██████████████ in exchange for a "reasonable" license agreement with Roberts.  Roberts breached this agreement, however, when it refused to offer Fun Sport such a license.

Roberts does not argue, nor can it, that the license agreement that it now seeks to force upon Fun Sport is reasonable.  Indeed, Roberts' proposed license agreement provides Fun Sport with ████████████████████████████████  Aside from the four license agreements that Roberts presented as exemplars of the type of license that Fun Sport could expect, the record is devoid of evidence regarding what constitutes a "reasonable" license agreement under these circumstances.  Certainly it is devoid of evidence that a license agreement ████████████████████████ is reasonable.

What makes the proffered license agreement *unreasonable* is that it provides ██ ████████████████████.  Roberts' "authentic airplane over a miniature golf course" is not like McDonald's golden arches, in which Fun Sport might derive benefit in the form of increased sales because of McDonald's national advertising and name recognition.  Indeed, there is no evidence that *anyone* in Delaware, Maryland, or anyplace else in the country, has ever heard of Roberts and its "authentic airplane suspended above a miniature golf course," and even if they did, there is no evidence that Fun Sport's use of the airplane would cause even one

additional person to visit Fun Sport's miniature golf course to offset the enormous expenditure that Roberts demands.

Not only is the license that Roberts urges this Court to impose unlikely to provide any increased revenues to Fun Sport, it may even increase Fun Sport's operating expenses because it imposes burdens and obligations on Fun Sport in the form of guidelines defined by Roberts. Moreover, Fun Sport would have to submit to Roberts' ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ (License Agreement, Ex. 14 at ¶ 5), and presumably make otherwise unnecessary changes to satisfy Roberts' standards.

The only benefit that Fun Sport might have hoped to derive from a license with Roberts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Roberts' ▮▮▮▮▮▮▮ license denies Fun Sport of even this benefit, especially considering ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Fun Sport offered to enter into a license agreement with Roberts that provided ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Fun Sport believed that that was a reasonable accommodation. Roberts did not, and rejected the offer. Fun Sport's settlement offer expired when Roberts rejected it. Beyond that point, Fun Sport had no obligation to continue negotiations, and acted fully within its rights when it notified Roberts that Fun Sport was terminating negotiations and would continue the litigation.

This Court cannot impose a license agreement on either Fun Sport or Roberts to which the parties did not agree. See *In re Enstar Corp.*, 604 A.2d 404, 415 (Del. Super. Ct. 1992) ("The court has no common law or statutory authority to impose an agreement upon the

17

parties"). To do so, this Court would be required to supply essential terms of the contract, which it is not permitted to do. (*Dittrick* at *5) ("specific performance will not be granted when the court has to supply essential terms of the contract" (quotations and citations omitted)).

Fun Sport offered to fulfill its obligations under the terms of an oral agreement to make a contract with Roberts. Fun Sport's obligations ended when Roberts refused to accept a reasonable license.

## CONCLUSION

For the reasons stated herein, Roberts Enterprises, Inc.'s Motion To Enforce Settlement Agreement should be DENIED.

POTTER ANDERSON & CORROON LLP

By:  /s/ William R. Denny
Richard L. Horwitz (#2246)
William R. Denny (#2580)
James M. Kron (#3898)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19889-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
wdenny@potteranderson.com
jkron@potteranderson.com

Dated:  October 10, 2007
Public Version Dated: October 17, 2007

*Attorneys for Defendant Fun Sport, Inc.*

825844 / 29926

18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, William R. Denny, hereby certify that on October 17, 2007, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on October 17, 2007, I have Electronically Mailed the documents to

the following person(s):

Rex A. Donnelly, IV
Ratner & Prestia
1007 Orange Street, Suite 1100
P.O. Box 1596
Wilmington, DE 19899-1596
radonnelly@ratnerprestia.com

John B. Hardaway III
Amy E. Allen
Nexsen Pruet Adams Kleemeier, LLC
201 W. McBee Avenue, Suite 400 (29601)
Post Office Drawer 10648
Greenville, SC  29603-0648
jhardaway@nexsenpruet.com
aallen@nexsenpruet.com

*/s/ William R. Denny*
Richard L. Horwitz (#2246)
William R. Denny (#2580)
James M. Kron (#3898)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
rhorwitz@potteranderson.com
wdenny@potteranderson.com
jkron@potteranderson.com

751485 / 29926

# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 9

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 13

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 14

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 15

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 16

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY